# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ATLAS DATA PRIVACY CORPORATION, et al., | |
| Plaintiffs, | Civil Action No.: 24-cv-04098 |
| vs. | |
| QUANTARIUM ALLIANCE, LLC, et al., | |
| Defendants. | |
| ATLAS DATA PRIVACY CORPORATION, et al., | |
| Plaintiffs, | Civil Action No.: 24-cv-04609 |
| vs. | |
| NUWBER, INC., et al., | |
| Defendants. | |
| ATLAS DATA PRIVACY CORPORATION, et al., | |
| Plaintiffs, | Civil Action No.: 24-cv-11023 |
| vs. | |
| SPY DIALER, INC., et al., | |
| Defendants. | |

| | |
|---|---|
| ATLAS DATA PRIVACY CORPORATION, et al., | |
| Plaintiffs, | Civil Action No.: 25-cv-05989 |
| vs. | |
| PUBLICNSA, LLC, et al., | |
| Defendants. | |
| ATLAS DATA PRIVACY CORPORATION, et al., | |
| Plaintiffs, | Civil Action No.: 25-cv-07650 |
| vs. | Honorable Harvey Bartle III, U.S.D.J. |
| TRUESOFTWARE SCANDINAVIA AB, et al., | |
| Defendants. | |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION

*Attorneys for Plaintiffs*

**PEM LAW LLP**
Rajiv D. Parikh
Kathleen Barnett Einhorn
Jessica A. Merejo
One Boland Drive, Suite 101
West Orange, New Jersey 07052
Telephone (973) 577-5500
Emails: rparikh@pemlawfirm.com
        keinhorn@pemlawfirm.com
        jmerejo@pemlawfirm.com

**BOIES SCHILLER FLEXNER LLP**
Adam Shaw (admitted *pro hac vice*)
30 South Pearl Street, 12th Floor
Albany, New York 12207
Telephone: (518) 434-0600
Email: ashaw@bsfllp.com

Mark C. Mao (admitted *pro hac vice*)
Julia Bront (admitted *pro hac vice*)
44 Montgomery Street, 41st Floor
San Francisco, California 94104
Telephone: (415) 293-6800
Email: mmao@bsfllp.com
        jbront@bsfllp.com

James Lee (admitted *pro hac vice*)
100 SE Second Street, Suite
2800 Miami, Florida 33131
Telephone: (305) 357-8434
Email: jlee@bsfllp.com

Eric Palmer (admitted *pro hac vice*)
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 377-4250
Email: epalmer@bsfllp.com

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................1

ARGUMENT .............................................................................................2

I.  JURISDICTIONAL DISCOVERY PROVES THAT DEFENDANTS ARE
    SUBJECT TO SPECIFIC PERSONAL JURISDICTION IN NEW JERSEY ....2

    A. Personal Jurisdiction is Established Under the *Calder* Effects Test. .......3

        *1.  Daniel's Law is An Intentional Tort* ....................................................4

        *2.  Plaintiffs Felt the Harm in New Jersey* ..............................................7

        *3.  Defendants Expressly Aimed Their Conduct at New Jersey* ...........11

II. DEFENDANT-SPECIFIC JURISDICTIONAL SHOWINGS .........................16

    A. Spy Dialer ...........................................................................................16

        *1.  Jurisdiction Exists Under the Calder Effects Test* .........................16

           *i.   Spy Dialer Acted Intentionally* ................................................16

          *ii.  Spy Dialer Knew the Plaintiffs Felt the Brunt of the Harm in New
               Jersey* .......................................................................................16

          *iii. Spy Dialer Expressly Aimed its Conduct at New Jersey* ..........18

        *2.  Jurisdiction Exists Under the Traditional Purposeful-Availment Test*
          ................................................................................................19

    B. Nuwber.................................................................................................20

        *1.  Jurisdiction Exists Under the Calder Effects Test* .........................20

           *i.   Nuwber Acted Intentionally* .....................................................20

          *ii.  Nuwber Knew the Plaintiffs Felt the Brunt of the Harm in New
               Jersey* .......................................................................................21

          *iii. Nuwber Admits it Expressly Aimed its Conduct at New Jersey*
           ............................................................................................23

        *2.  Jurisdiction Exists Under the Traditional Purposeful-Availment Test*
          ............................................................................................24

    C. PublicNSA............................................................................................25

        *1.  Jurisdiction  Exists  Under  the  Calder  Effects  Test*
          ..........................................................................................25

           *i.   PublicNSA Acted Intentionally* .............................................25

          *ii.  PublicNSA Knew the Plaintiffs Felt the Brunt of the Harm in  New
               Jersey* .......................................................................................26

          *iii. PublicNSA Admits it Expressly Aimed its Conduct at New Jersey*
           ............................................................................................28

2. *Jurisdiction Exists Under the Traditional Purposeful-Availment Test* ....................................................................29

D. TrueSoftware .................................................................39

1. *Jurisdiction Exists Under the Calder Effects Test* ..................................................................................39

i. *TrueSoftware Acted Intentionally* ..........................................39

ii. *TrueSoftware Knew the Plaintiffs Felt the Brunt of the Harm in New Jersey* ..............................................................40

iii. *TrueSoftware Expressly Aimed its Conduct at New Jersey* ..................................................................41

2. *Jurisdiction Exists Under the Traditional Purposeful-Availment Test* ..................................................................42

E. Quantarium ................................................................43

1. *Jurisdiction Exists Under the Calder Effects Test* .....................43

i. *Quantarium Acted Intentionally* ..........................................43

ii. *Quantarium Knew the Plaintiffs Felt the Brunt of the Harm in New Jersey* ..............................................................44

iii. *Quantarium Expressly Aimed its Conduct at New Jersey* .....45

2. *Jurisdiction Exists Under the Traditional Purposeful-Availment Test* ..................................................................46

III. DEFENDANTS CANNOT SHOW THAT EXCERCISING JURISDICTION IS UNCONSTIUTIONAL. ..................................................................47

CONCLUSION ..................................................................48

## TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Ameripay, LLC v. Ameripay Payroll, Ltd.*,
   334 F.Supp.2d 629 (D.N.J. 2004) ................................................................... 2

*Atlas Data Priv. Corp. v. We Inform, LLC*,
   No. CV 24-4037, 2025 WL 2444153 (D.N.J. Aug. 25, 2025).............................. 7

*Briskin v. Shopify, Inc.*,
   135 F.4th 739 (2025)............................................................................... Passim

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ................................................................... 3, 34, 37

*Calder v. Jones*,
   465 U.S. 783 (1984) ................................................................... Passim

*Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*,
   592 U.S. 351 (2021) ................................................................... Passim

*Hasson v. FullStory, Inc.*,
   114 F.4th 181 (3d Cir. 2024)........................................................ Passim

*Hepp v. Facebook*,
   14 F.4th 204 (3d Cir. 2021)................................................................ 29

In *Goldfarb v. Kalodimos*,
   539 F. Supp. 3d 435 (E.D. Pa. 2021) ........................................... Passim

*Johnson v. Griffin*,
   85 F.4th 429 (6th Cir. 2023) ....................................................... Passim

*Marten v. Godwin*,
   499 F.3d 290 (3d Cir. 2007)............................................................. 11

*Massie v. Gen. Motors Co.*,
   2021 WL 2142728 (E.D. Cal. May 26, 2021) ..................................... 14

*Mavrix Photo, Inc. v. Brand Techs., Inc.,*
  647 F.3d 1218 (9th Cir. 2011)........................................................................... 19, 24

*Mellon Bank (East) PSFS v. Farino,*
  960 F.2d 1217 (3d Cir. 1992)............................................................................ 2, 31, 47

*Monturi v. Englewood Hosp.,*
  588 A.2d 408 (App. Div. 1991) .......................................................................... 6

*Remick v. Manfredy,*
  238 F.3d 248 (3d Cir. 2001).................................................................................. 3

*Schnur v. JetBlue Airways Corp.,*
  2024 WL 2816552 (W.D. Pa. June 3, 2024)........................................................ 14

*Toys "R" Us, Inc. v. Step Two, S.A.,*
  318 F.3d 446 (3d Cir. 2003)............................................................................... 15, 34

*Venuto v. Atlanstis Motor Group,* LLC,
  2018 WL 2134035 (D.N.J. May 9, 2018) ........................................................... 34

*Vonbergen v. Liberty Mut. Ins. Co.,*
  705 F. Supp. 3d 440 (E.D. Pa. 2023) .............................................................. 4, 19, 24

*Walden v. Fiore,*
  571 U.S. 277 (2014) .........................................................................................Passim

## **Statutes**

NJ J.I. CIV 3.10 ........................................................................................................ 7

NJ J.I. CIV 3.11A ..................................................................................................... 7

NJ J.I. CIV 3.11B ..................................................................................................... 7

NJ J.I. CIV 3.12 ....................................................................................................... 7

NJ J.I. CIV 3.13 ....................................................................................................... 7

NJ J.I. CIV 3.14 ....................................................................................................... 7

N.J. Stat. Ann. § 56:8-166.1 ........................................................................ 4

N.J.S.A. 56:8-166.3 ..................................................................................... 8

N.J.S.A. 56:8-166.1(a)(1) ........................................................................... 13

## **Other Authorities**

Restatement (Second) of Torts §§ 161 ....................................................... 6

## PRELIMINARY STATEMENT

Defendants' jurisdictional arguments rests on the false premise that because they offer data services nationwide or globally, they are subject to personal jurisdiction nowhere specifically. The law is the opposite. Personal jurisdiction does not turn on how broadly a defendant markets its services, but on whether the defendant deliberately engaged in forum-connected conduct or expressly aimed and knew the resulting harm would be felt there. Courts therefore look at what the defendant did, what it knew about the wrongful activity and its effects, and whether it purposefully availed itself of the forum by directing its conduct at forum residents.

Discovery has confirmed exactly what Plaintiffs alleged: Defendants Spy Dialer, Nuwber, PublicNSA, Quantarium Alliance, and TrueSoftware intentionally collected and monetized the protected information of New Jersey residents and knowingly disclosed that protected information after receiving Daniel's Law nondisclosure requests. Defendants' own witnesses testified that they knew their platforms published New Jersey addresses and phone numbers; that New Jersey residents and businesses regularly accessed their services; that nondisclosure requests specifically identified New Jersey Covered Persons; that disclosures of addresses and phone numbers affect a person's personal privacy and safety rights; and that Defendants made deliberate decisions not to remove or suppress that information after notice. That testimony independently establishes personal

1

jurisdiction under both the *Calder* effects test and the traditional purposeful-availment framework.

This is not a close case. Defendants intentionally engaged in conduct they knew would cause harm to New Jersey residents in New Jersey, while systematically exploiting New Jersey data for commercial gain. Under settled Supreme Court and Third Circuit precedent, personal jurisdiction plainly exists. Defendants' motions to dismiss should be denied.

## <u>ARGUMENT</u>

I. **JURISDICTIONAL DISCOVERY PROVES THAT DEFENDANTS ARE SUBJECT TO SPECIFIC PERSONAL JURISDICTION IN NEW JERSEY**

Federal courts analyze specific personal jurisdiction under a three-part test. ***First***, Plaintiffs must show that the defendant took "some act by which it purposefully avails itself of the privilege of conducting activities within the forum State." ***Second***, "[t]he plaintiff's claims…must arise out of or relate to the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 592 U.S. 351, 359 (2021) (quotation marks and citation omitted). ***Third***, if both threshold requirements are met, "the burden shifts to the defendant, who must show that the assertion of jurisdiction would be unreasonable.'" *Ameripay, LLC v. Ameripay Payroll, Ltd*., 334 F.Supp.2d 629, 633 (D.N.J. 2004) (citing *Mellon Bank (East) PSFS v. Farino*, 960 F.2d 1217, 1226 (3d Cir. 1992)); *Briskin v. Shopify, Inc.*,

2

135 F.4th 739, 751 (2025) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

The Third Circuit applies two complementary frameworks depending on the nature of the defendant's conduct: (i) the *Calder* effects test, derived from *Calder v. Jones*, 465 U.S. 783 (1984); and (ii) the traditional purposeful availment test articulated in *Ford*, 592 U.S. at 359. *See Hasson v. FullStory, Inc.*, 114 F.4th 181, 187 (3d Cir. 2024).

The *Calder* test is used to establish personal jurisdiction over out-of-state defendants who, despite minimal contacts with the forum, cause intentional harm there. *Id.* The traditional test is used to obtain personal jurisdiction over out-of-state defendants with sufficient direct in-forum activities. *Id.*

**A. Personal Jurisdiction is Established Under the *Calder* Effects Test.**

Under the *Calder* test, personal jurisdiction over a defendant is proper if the forum is the "focus" of the defendant's tortious conduct. *Hasson*, 114 F.4th at 187. Courts applying *Calder* evaluate whether "(1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum; and (3) the defendant expressly aimed his tortious conduct at the forum." *Id.* (citing *Remick v. Manfredy*, 238 F.3d 248, 258 (3d Cir. 2001)).

"When a plaintiff claims that a defendant committed an intentional tort, the Court must consider whether jurisdiction is appropriate under the *Calder* effects

test." *Vonbergen v. Liberty Mut. Ins. Co.,* 705 F. Supp. 3d 440, 449 (E.D. Pa. 2023). Here, Defendants are alleged to have committed intentional torts aimed at a New Jersey resident with knowledge that the brunt of the harm would be felt in New Jersey. The facts demonstrate that Defendants are subject to personal jurisdiction under the *Calder* test.

### 1. Daniel's Law is An Intentional Tort

*First,* it is clear that Daniel's Law creates an intentional tort. Defendants half-heartedly in a footnote contend that the law does not establish an intentional tort because it requires some negligent action. Defendants are wrong and their failure to address the issue should preclude them from expounding on it in reply.

At a minimum, Plaintiffs allege that every Defendant willfully violated Daniel's Law subjecting them to punitive damages, such that the Complaints allege that Defendants engaged in intentional conduct.

But more fundamentally, under Daniel's Law, a defendant cannot be held liable unless it commits an intentional act—namely it must "deliver, transfer, post, publish, distribute, . . . or otherwise make available" a covered person's protected information. N.J. Stat. Ann. § 56:8-166.1. As with other intentional torts, the requisite intent concerns the mental state required to commit the act itself, not any specific intent to cause a resulting harm. Here, Defendants must specifically intend

4

to publish the protected information.  Unknowingly publishing the information is not enough.  But Defendants need not specifically intend to cause the harm.

The law has long rejected any "double-intent" requirement in intentional torts. In battery, for example, a defendant must intentionally make contact with another person.  But the defendant need not specifically intend that touching to be offensive. In contrast to the intentional touching element, the offensiveness element is assessed under an objective standard.

The same structure applies here. Under Daniel's Law, the counterpart to "offensiveness" is **notice**: once a covered person provides a nondisclosure request, the Defendants' continued disclosure renders their intentional act of publication wrongful.

That is where Defendants' argument fails.  They claim that Daniel's Law is not an intentional tort because a defendant must be at least negligent as to whether they were on notice that they would be violating the law.  But Defendants fail to recognize that they must act intentionally in publishing the protected information to be liable.

This distinction matters. What makes Daniel's Law an intentional tort is the requirement of an intentional act of publication.  If a company mistakenly transmits an address once and promptly corrects the error upon learning of it, it has not engaged in an intentional tort. But where a defendant knowingly continues to publish

5

or distribute information after receiving notice that the disclosure violates Daniel's Law, the conduct is intentional—even if the defendant did not specifically intend to disclose that particular covered person's information. Daniel's Law permits liability where the inclusion of protected information results from negligence, but the tort remains intentional because the act of disclosure itself is deliberate.

So long as the statute requires an intentional act of disclosure, the tort is properly classified as intentional for *Calder* purposes, even if the mens rea required as to other elements (such as the inclusion of a particular individual's information) does not demand specific intent.

Classifying Daniel's Law as an intentional tort is consistent with how other torts are classified. Intentional torts often impose an intent requirement only on the conduct without requiring any specific intent as to the harmful or wrongful effects of that conduct. *See, e.g.*, *Monturi v. Englewood Hosp.*, 588 A.2d 408, 410 (App. Div. 1991) (battery requires only intentional contact but not specific intent that the contact is harmful or offensive). This is especially true for torts that require a defendant to have notice. *See, e.g.*, Restatement (Second) of Torts §§ 161 (continuing trespass) & 825 (intentional nuisance).

Daniel's Law is just like many of the privacy torts that New Jersey courts routinely characterize as intentional: they require both an intentional disclosure and notice. All of the analogous privacy torts are classified as intentional torts in the New

6

Jersey Model Civil Jury Charges. *See* Assault and Battery, NJ J.I. CIV 3.10; Public Defamation, NJ J.I. CIV 3.11A; Private Defamation, NJ J.I. CIV 3.11B; Malicious Prosecution Action Based Upon a Prior Criminal Proceeding, NJ J.I. CIV 3.12; Malicious Prosecution Based Upon a Prior Civil Proceeding, NJ J.I. CIV 3.13; Invasion of Privacy, NJ J.I. CIV 3.14; *see also* Dkt. 73 p. 17 n.9.

### 2. *Plaintiffs Felt the Harm in New Jersey*

**Second**, Defendants' tortious out-of-state conduct causes harmful effects felt in New Jersey. As the Sixth Circuit recently held, when a defendant knowingly discloses personal information and understands that the resulting risk of harassment or violence will be experienced where the plaintiff resides, the "brunt of the harm" element of *Calder* is satisfied. *Johnson v. Griffin*, 85 F.4th 429, 433 (6th Cir. 2023). By continuing to disclose the protected information of New Jersey residents, Defendants continue to put a Covered Person at risk of violence or harassment in New Jersey. (*See* Compl. ¶¶ 2–3, 8–9, 15–24.) [1] And this risk of harassment, intimidation, or retaliation interferes with covered persons' ability to perform their duties as New Jersey public servants as well as with the state's ability to make public service safe. (*See* Compl. ¶¶ 2–3, 8–9, 15–24); *Atlas Data Priv. Corp. v. We Inform, LLC*, No. CV 24-4037, 2025 WL 2444153, at *2 (D.N.J. Aug. 25, 2025) ("Daniel's

---

[1] Citations to "Compl." refer to the operative complaint filed in *Atlas Data Priv. Corp. v. Quantarium Alliance, LLC,* No. 1:24-cv-04098.

7

Law was enacted in 2020 and since amended to "enhance the safety and security of certain public officials in the justice system, including judicial officers, law enforcement officers, child protective investigators in the Division of Child Protection and Permanency, and prosecutors.") (citing N.J.S.A. 56:8-166.3).

Moreover, the Defendants are data brokers and related businesses. They purvey in the sale and distribution of information about people and their addresses and phone numbers. They know that this information affects individual's privacy and safety interests. Indeed (almost) every Defendant has extensive policies that purport to govern the privacy of the address and phone number information they publish. And there can be no doubt that they know that the publication of individuals' addresses and phone numbers affect those individuals where they live. Providing personal information about the location and phone numbers of their subjects is the very core of Defendants' businesses.

It would be incredible for Defendants to assert that they do not know that they are affecting the privacy rights of individuals where they live. And in this case it would be incredible for Defendants to assert that they do not know that they are affecting the privacy rights of New Jersey residents and causes them harm in New Jersey.

Consider the facts of *Calder*.

The defendants were a reporter and an editor based in Florida who wrote and approved an allegedly defamatory article about actress Shirley Jones. *Calder*, 465 U.S. at 784–85. Crucially, the court emphasized that the defendants knew Jones lived and worked in California, that her professional reputation was centered there, and that the "brunt of the injury" from any defamatory publication would be suffered there. *Id.* at 788–89. The defendants' conduct was therefore not merely foreseeable in its effects; it was undertaken with knowledge that the injury would be experienced in California. The court explained that even though the defendants never traveled to California and performed their work entirely in Florida, they could reasonably anticipate being haled into a California court because they acted with full awareness of where the consequences of their conduct would land. *Id.* at 789–90.

Likewise, in *Johnson v. Griffin*, the court considered what the defendant knew about the plaintiff at the time of the intentional conduct. There, defendant Kathy Griffin, a California-based celebrity with approximately two million Twitter followers, used her social-media platform to launch a targeted campaign against Samuel Johnson, the CEO of VisuWell, a Tennessee-based company. *Johnson*, 85 F.4th 429 at 431. Griffin sent a series of tweets accusing Johnson of homophobic conduct and expressly encouraged her followers to make him "online famous." *Id.* She tagged VisuWell's corporate Twitter account and urged Johnson's employer to remove him from the company's Board of Directors. *Id.* In finding specific

9

jurisdiction over Griffin, the court focused on what Griffin knew at the time she acted: Griffin knew Johnson's professional identity, knew where his employment was centered, and knew that any reputational and economic harm resulting from her tweets would be felt in Tennessee. *Id.* at 433.

In *Goldfarb v. Kalodimos*, the plaintiff was a physician affiliated with the University of Pennsylvania health system, whose medical practice and professional reputation were centered in Pennsylvania. 539 F. Supp. 3d 435 at 442. The defendants, who lived outside Pennsylvania, published false and damaging statements about the plaintiff online. *Id.* The defendants knew exactly who the plaintiff was and where his professional life was centered. *Id.* at 453. Their statements targeted the plaintiff's conduct as a physician and directly implicated his role within the University of Pennsylvania medical community. *Id.* Because of that affiliation, the defendants understood that any reputational or professional harm would occur in Pennsylvania, where the plaintiff treated patients and maintained his practice. *Id.* at 454. The defendants therefore knew, at the time they published the statements, that the "focal point of the harm" would be Pennsylvania, even though the statements were accessible online nationwide and the defendants themselves resided elsewhere. *Id.* at 454, n. 8.

The same analysis applied in *Briskin v. Shopify, Inc*. The plaintiff, Briskin, a California resident, filed a putative class action against Shopify, Inc., a Canadian

10

corporation, and its U.S. subsidiaries, Shopify (USA), Inc. and Shopify Payments (USA), Inc. *Briskin*, 135 F.4th 739 at 746. Briskin alleged that Shopify violated various California privacy and consumer protection laws by installing tracking cookies on his device without his knowledge or consent during an online purchase. *Id.* at 747. These cookies allegedly tracked his location and online activity, and Shopify used the collected data to create consumer profiles, which it marketed to third parties, including California merchants. *Id.* at 747–48. In finding specific personal jurisdiction, the court focused on the facts that  1) Shopify conceded that its geolocation technology allowed it to know that Briskin's device was located in California when it installed cookies on Briskin's device; and (2) the complaint alleged that Shopify used the data gathered by its cookies to compile consumer profiles and sell them without the consumer's knowledge or consent. *Id.*  at 745.

Thus, upon receiving a non-disclosure request from a New Jersey-based Covered Person, Defendants knew that Plaintiffs "would suffer the brunt of the harm caused by the tortious conduct *in the forum*." *Hasson*, 114 F.4th at 196 (quoting *Marten v. Godwin*, 499 F.3d 290, 298 (3d Cir. 2007)).

### 3.  *Defendants Expressly Aimed Their Conduct at New Jersey*

**Third**, Defendants' "expressly aimed" their conduct at New Jersey by disclosing or continuing to disclose protected information that they knew concerned New Jersey residents. Courts routinely find express aiming where an out-of-state

11

defendant knowingly publishes or disseminates harmful information about forum residents, even where the defendant has no physical presence in the forum. *See Goldfarb v. Kalodimos*, 539 F. Supp. 3d 435, 453–54 (E.D. Pa. 2021) (finding express aiming satisfied where out-of-state defendant knowingly published harmful material about Pennsylvania resident, causing harm felt in Pennsylvania).

Here, Defendants know that they are publishing information about New Jersey because the location is the very content that Defendants are conveying in violation of the law. This is not the case of disseminating some non-geographic information that is defamatory or even improperly disclosing non-location-specific private information. The very information that is being wrongfully disclosed ***is that it is in New Jersey***. There could be no more express aiming than that.

That is the same reason courts have found express aiming in analogous cases. In *Calder*, the defendants' article expressly identified facts about the plaintiff's life and career in California, making California part of the story itself—not merely the place where consequences were later felt. In *Johnson v. Griffin*, Kathy Griffin's tweets did not merely criticize an individual; they identified his employer and professional role, tying the speech to the specific place where his employment existed. In *Goldfarb v. Kalodimos*, the defendants' statements targeted a physician's professional conduct at the University of Pennsylvania, embedding Pennsylvania into the content of the publication. And in *Briskin v. Shopify, Inc.*, Shopify's data

collection was not geographically neutral: the content of the data itself identified where the transaction occurred, such that Shopify knew it was collecting information tied to California at the moment of collection.

Further, Defendants know that the controverted publications concern New Jersey because the law requires that they receive notice to be liable for the subsequent publication. Defendants cannot be liable under Daniel's Law without notice that continued disclosure violates the rights of covered persons in New Jersey under New Jersey law. *See* N.J.S.A. 56:8-166.1(a)(1). By continuing to disclose the information regardless, Defendants purposefully direct their tortious conduct at the forum state. (*See* Compl. ¶¶ 37–40, 43.); *see, e.g.*, *Johnson v. Griffin*, 85 F.4th 429, 433 (6th Cir. 2023); *Goldfarb*, 539 F. Supp. 3d 435 at 453–54.

The notice procedure under Daniel's Law distinguishes these cases from *Hasson*. In *Hasson*, Papa John's used its website to deploy code onto users' browsers that collected their geolocation data. The Third Circuit affirmed dismissal of wiretapping claims against Papa John's on the basis of this data collection because Papa John's only learned that the location data belonged to forum residents *after* the allegedly tortious collection. *Hasson*, 114 F.4th at 192. Here, by contrast, Defendants had notice. Defendants *knew* that the information concerned New Jersey residents before Defendants continued to disclose the information. *See Hasson*, 114 F.4th at 196.

13

This tortious conduct was also directed at the forum in other ways. As Defendants' corporate representatives testified, Defendants either collected or solicited data on New Jersey residents, often drawn from New Jersey public records. *See infra* Sec. II.A-E.  Unlike in *Hassan*, Defendants know *ex ante* that the data they sell concerns New Jersey. Defendants sell or furnish this data to customers or users primarily in New Jersey. (*See* Compl. ¶¶ 2, 37–41, 43, 54–55.); *Schnur v. JetBlue Airways Corp.*, 2024 WL 2816552, at *5–6 (W.D. Pa. June 3, 2024); *Massie v. Gen. Motors Co.*, 2021 WL 2142728, at *5 (E.D. Cal. May 26, 2021). Moreover, the *Hasson* court recognized that "courts have found express aiming where . . . the website is 'targeted at a particular jurisdiction,'" which "can be evidenced by content bearing a particular nexus to that forum or location-specific advertisements." *Hasson*, 114 F.4th at 190.

## B. The Court Should Also Analyze Jurisdiction Under the Traditional Purposeful Availment Test.

In addition to the *Calder* test, the Court should also consider whether personal jurisdiction is proper under the traditional purposeful availment test. *See Hasson*, 114 F.4th at 197 ("Though we agree with its application of *Calder*, the District Court also should have considered whether specific personal jurisdiction was proper under the traditional test as applied in *Ford Motor*."). To show purposeful availment of the forum state, Plaintiffs "must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State or

14

entering a contractual relationship centered there." *Ford*, 592 U.S. at 360 (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)). As discussed above, plaintiffs' claims "must arise out of or relate to the defendant's contacts." *Id.* at 359.

Defendants testimony establish the necessary minimum contacts because each "purposefully avail[ed] itself of the privilege of conducting activities within the forum' and 'invoke[ed] the benefits and protections of [the forum's] laws.'" *Hasson*, 114 F.4th at 186 (quoting *Toys "R" Us*, 318 F.3d at 451). Defendants admit to purposefully collecting data on New Jersey residents (Compl. ¶ 40), procuring data, in many cases, from New Jersey public records (*id.* at ¶¶ 2, 40), and knowing that the customers or users of that information are in New Jersey (*see id.* at. ¶¶ 37–41.).

There can be no serious dispute that Plaintiffs' claims under Daniel's Law—the crux of which turn on Defendants' disclosure of New Jersey residents' phone numbers and addresses—"arise out of or relate to" these New Jersey-centered contacts. And because each Defendant was given a nondisclosure notice under New Jersey law, they should have each "reasonably anticipated being haled into court" in New Jersey. *Hasson*, 114 F.4th at 186. Each element is satisfied here by Defendants' own testimony.

## II.    DEFENDANT-SPECIFIC JURISDICTIONAL SHOWINGS

### A. Spy Dialer[2]

#### 1.  *Jurisdiction Exists Under the Calder Effects Test*
##### i.   *Spy Dialer Acted Intentionally*

Spy Dialer testified that it knowingly identifies New Jersey phone numbers and addresses on its website, and the information remains publicly accessible unless affirmatively filtered or removed through Spy Dialer's opt-out process. Scott Dep. 63:10–13; 78:13–15; 79:3–5; 80:12–81:7. Thus, Spy Dialer's intentional disclosure of protected information after notice of covered person's nondisclosure requests constitutes intentional conduct for purposes of the effects test. *Walden*, 571 U.S. at 286 ("[Jurisdiction] over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum.").

##### ii.   *Spy Dialer Knew the Plaintiffs Felt the Brunt of the Harm in New Jersey*

Spy Dialer admitted that it was aware it had access to New Jersey phone numbers and addresses through its data sources. Scott Dep. 63:10–13. Spy Dialer also admitted that it routinely receives communications from users raising privacy concerns and dissatisfaction about their information being publicly available (Scott

---

[2] Attached as Exhibit A to the declaration of Raj Parikh ("Parikh declaration"), filed concurrently herewith, is the relevant excerpts from the deposition of Robert Scott ("Scott Dep."). Robert Scott is the 30(b)(6) witness designated by Spy Dialer, Inc. ("Spy Dialer").

Dep. 96:13–17; 98:5–8), including safety concerns (Scott Dep. 106:8–13; 106:24–107:3). Spy Dialer conceded that when New Jersey residents experience safety concerns arising from Spy Dialer's publication of their information, those concerns occur in New Jersey. Scott Dep. 111:4–20. Spy Dialer similarly acknowledged that when a New Jersey resident is worried that their privacy is being violated by information on Spy Dialer, that worry is experienced in New Jersey. *Id.*

Not only do Plaintiffs allege that they experienced harm at their place of residency within the State of New Jersey, but Spy Dialer also admittedly knew that such harm from privacy violations would occur in New Jersey as well. This prior knowledge is sufficient to satisfy *Calder*. *See Calder*, 465 U.S. at 789–90 (finding jurisdiction proper where defendants knew the plaintiff lived and worked in California and understood that any reputational harm from their publication would be felt there); *see also Johnson*, 85 F.4th at 433–34 (holding that defendant acted with knowledge that economic and reputational harm from her tweets would be suffered where the plaintiff's employment was located); *Goldfarb*, 539 F. Supp. 3d at 453–54 (finding jurisdiction proper where defendants knew the plaintiff practiced medicine in Pennsylvania and understood that professional harm would be felt there); *Briskin*, 135 F.4th at 759–60 (holding that defendant knowingly collected and used data tied to a California resident, with awareness that any privacy injury would occur in California).

17

### iii. Spy Dialer Expressly Aimed its Conduct at New Jersey

Spy Dialer's witness testified that it purchases its data from OpenData People, a data aggregator that collects information directly from federal, state, and local government agencies (Scott Dep. 30:15–31:16; 133:19–24), and that OpenData People has obtained information from New Jersey-related entities (Scott Dep. 135:10–16). Spy Dialer further acknowledged that the data originates from public-record sources (Scott Dep. 32:4–9) and that public records used by Spy Dialer include New Jersey records (Scott Dep. 59:3–5). When a user searches for an individual in New Jersey, the information returned is New Jersey data (Scott Dep. 112:19–113:17), and Spy Dialer stated that it is a "safe assumption" that this information originates from New Jersey public records. *Id.* This targeted act of mining local New Jersey county assessors' records for New Jersey-specific data constitutes an "intentional physical entry" (*Hasson*, 114 F.4th at 191) into the forum sufficient to establish "express aiming" under *Calder.*

Spy Dialer also acknowledged that it deliberately included New Jersey-specific legal disclosures on its website referencing New Jersey privacy law. Scott Dep. 82:19–83:25. The witness testified that he personally added that language so users would know Spy Dialer was aware of New Jersey's privacy law and believed it applied to the information at issue with an exemption. *Id*. In addition, Spy Dialer testified that it tracks the state of residence of individuals submitting opt-out requests

18

(Scott Dep. 78:13–15; 79:3–5; 80:12–81:7) and could determine how many opt-outs originated from New Jersey through technical investigation, estimating that such opt-outs could number in the hundreds or thousands (Scott Dep. 88:7–20).

This evidence establishes that Spy Dialer knowingly and deliberately continued to disseminate New Jersey residents' information with full awareness that it was targeting New Jersey residents and implicating New Jersey law. *See Briskin* 135 F.4th 739 at 757 (express aiming element is satisfied if defendant "knows— either actually or constructively"—that conduct is aimed at the forum) (quoting *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1230 (9th Cir. 2011)); *Vonbergen,* 705 F. Supp. 3d 440 at 451 ("[E]xpress aiming" is satisfied if the defendant "knew, at least constructively" that it was targeting a plaintiff in a forum).

### 2. *Jurisdiction Exists Under the Traditional Purposeful-Availment Test*

Spy Dialer acquires and disseminates data originating from New Jersey public records (Scott Dep. 59:3–5; 112:19–113:17; 114:14–21), including phone numbers and address information relating to New Jersey residents. Spy Dialer publishes that data on a website that is fully accessible in New Jersey, with no functionality restricted from New Jersey users (Scott Dep. 115:1–6). Spy Dialer further acknowledged that its advertising and promotional content—including unpaid social-media posts—can be viewed from New Jersey (Scott Dep. 93:8–10; 93:21–

19

24). These contacts reflect Spy Dialer's deliberate exploitation of New Jersey-sourced data, marketed to New Jersey residents, as part of its commercial operations.

The claims against Spy Dialer arise directly from its New Jersey contacts. Plaintiffs challenge Spy Dialer's acquisition, publication, and continued dissemination of New Jersey residents' personal information, which is admittedly derived from New Jersey public records (Scott Dep. 112:19–113:17) and delivered through a platform accessible in New Jersey (Scott Dep. 115:1–6). Thus, these contacts evidence that Spy Dialer "systematically served a market in [New Jersey] for the very [information] that the plaintiffs allege[]…injured them in" the forum. *Hasson*, 114 F.4th at 193 (quoting Ford Motor, 592 U.S. at 365). Spy Dialer's own testimony confirms that its New Jersey-related conduct is the very conduct at issue, satisfying the "arise out of or relate to" requirement for specific jurisdiction.

## B. Nuwber[3]

### 1. *Jurisdiction Exists Under the Calder Effects Test*
#### i. *Nuwber Acted Intentionally*

Nuwber's testimony establishes intentional conduct. Nuwber affirmatively collects, aggregates, and publishes individuals' personal contact information—including street addresses and phone numbers—as part of its core business.

---

[3] Attached as Exhibit B to the Parikh declaration is the relevant excerpts from the deposition of Anton Nikanchyk ("Nikanchyk Dep."). Anton Nikanchyk is the 30(b)(6) witness designated by Nuwber, Inc. ("Nuwber").

Nuwber's witness testified that search results returned on Nuwber's website include basic publicly available information such as "street address[es], phone number[s, and] relatives." Nikanchyk Dep. 39:25–40:8. Nuwber also acknowledged that it collects data from "multiple public records and consumer databases," as stated on its own website. Nikanchyk Dep. 41:13–42:10 (acknowledging website language stating that Nuwber "collect[s] data from multiple public records and consumer databases").

Nuwber further admitted that it maintains information associated with approximately 8,055,517 individuals tied to New Jersey addresses available on its website. Nikanchyk Dep. 51:6–14. Maintaining and publishing millions of New Jersey-addressed records is not accidental or passive—it is the result of deliberate, intentional conduct. *See Walden*, 571 U.S. 277 at 286 ("[Jurisdiction] over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum.").

ii. *Nuwber Knew the Plaintiffs Felt the Brunt of the Harm in New Jersey*

Nuwber's testimony also establishes that the brunt of the harm from its conduct is felt in New Jersey. Nuwber admitted that it maintains millions of records associated with New Jersey addresses (Nikanchyk Dep. 51:6–14), meaning the affected individuals reside in New Jersey. When those individuals experience

21

privacy harms from the public availability of their street addresses and phone numbers, those harms necessarily occur where they live.

Nuwber further acknowledged that suppression requests it receives often include address information identifying the individual, including addresses containing the letters "N" and "J," reflecting New Jersey locations. (Nikanchyk Dep. 90:13–23) (testifying that requests contained "N" and "J" and could be understood as New Jersey addresses). The resulting privacy invasion and emotional distress therefore occur in New Jersey. This prior knowledge is sufficient to satisfy *Calder*. *See Calder*, 465 U.S. at 789–90 (finding jurisdiction proper where defendants knew the plaintiff lived and worked in California and understood that any reputational harm from their publication would be felt there); *see also Johnson*, 85 F.4th at 433–34 (holding that defendant acted with knowledge that economic and reputational harm from her tweets would be suffered where the plaintiff's employment was located); *Goldfarb*, 539 F. Supp. 3d at 453–54 (finding jurisdiction proper where defendants knew the plaintiff practiced medicine in Pennsylvania and understood that professional harm would be felt there); *Briskin*, 135 F.4th at 759–60 (holding that defendant knowingly collected and used data tied to a California resident, with awareness that any privacy injury would occur in California).

### iii. *Nuwber Admits it Expressly Aimed its Conduct at New Jersey*

Nuwber admitted that its website is accessible to New Jersey residents and that New Jersey residents can use the free version of the platform. Nikanchyk Dep. 47:22–48:10 (testifying that Nuwber "can be accessed by anyone who has access to internet," including New Jersey residents). Nuwber further acknowledged that its search results include New Jersey residents as part of its nationwide database. *Id.* Critically, Nuwber admitted that it knowingly maintains millions of records associated with New Jersey addresses on its platform. Nikanchyk Dep. 51:6–14. That volume of New Jersey-specific data reflects deliberate inclusion of New Jersey residents—not incidental or fortuitous contact.

Nuwber also testified that it receives and processes suppression and opt-out requests, including large volumes of requests tied to specific individuals and addresses, and that it evaluates whether those requests match records in its database before deciding whether to remove information. Nikanchyk Dep. 81:9–14; 83:3–84:8; 86:20–87:24 (describing receipt of "an avalanche" of requests and Nuwber's process for matching and removal). Those admissions confirm that Nuwber knowingly evaluates and acts upon requests tied to specific individuals, including New Jersey residents.

Taken together, this evidence establishes that Nuwber deliberately publishes and maintains New Jersey residents' information while knowingly engaging with

23

New Jersey-specific data and requests, satisfying the express-aiming requirement. *See Briskin,* 135 F.4th 739 at 757 (location-specific data collection constitutes express aiming) (quoting *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1230 (9th Cir. 2011)); *Vonbergen,* 705 F. Supp. 3d 440 at 451 ("[E]xpress aiming" is satisfied if the defendant "knew, at least constructively" that it was targeting a plaintiff in a forum).

### 2.  *Jurisdiction Exists Under the Traditional Purposeful-Availment Test*

Nuwber's testimony confirms deliberate and systematic contacts with New Jersey. Nuwber publishes search results containing New Jersey residents' street addresses and phone numbers (Nikanchyk Dep. 39:25–40:8), maintains millions of records associated with New Jersey addresses (Nikanchyk Dep. 51:6–14), and operates a website that is fully accessible to New Jersey residents (Nikanchyk Dep. 47:22–48:10). Nuwber also works with data brokers that supply publicly available information used in background check reports and similar products (testifying regarding another data broker providing Nuwber publicly available data) (Nikanchyk Dep. 57:13–58:5).

These activities reflect deliberate exploitation of New Jersey-sourced data and New Jersey residents as part of Nuwber's business model. Thus, these contacts evidence that Nuwber "systematically served a market in [New Jersey] for the very

[information] that the plaintiffs allege[]…injured them in" the forum. *Hasson*, 114 F.4th at 193 (quoting *Ford Motor*, 592 U.S. at 365). Nuwber's own testimony confirms that its New Jersey-related conduct is the very conduct at issue, satisfying the "arise out of or relate to" requirement for specific jurisdiction.

### C. PublicNSA[4]

#### 1. Jurisdiction Exists Under the Calder Effects Test
##### i. PublicNSA Acted Intentionally

PublicNSA does not passively host information; it affirmatively licenses individuals' personal data—including "names, telephone numbers, and home addresses"—to its customers as part of its core business. Mack Dep. 20:18–21. Since at least 2023, the data PublicNSA licensed has included home addresses for approximately 12.2 million New Jersey adults, and phone numbers for approximately 60% of those individuals. Mack Dep. 88:1–12.

That figure exceeds New Jersey's total adult population by millions, underscoring that PublicNSA's conduct is not incidental or isolated but instead involves the intentional, systematic licensing of personal data relating to all or nearly all New Jersey residents. *See Walden*, 571 U.S. 277 at 286 ("[Jurisdiction] over an out-of-state intentional tortfeasor must be based on intentional conduct by the

---

[4] Attached as Exhibit C to the Parikh declaration is the relevant excerpts from the deposition of Brad Mack ("Mack Dep."). Brad Mack is the 30(b)(6) witness designated by PublicNSA, LLC ("PublicNSA").

defendant that creates the necessary contacts with the forum."). PublicNSA's recognition of the risks posed by this conduct further confirms its intentional nature: its CEO testified that one of the company's missions is "making sure that data doesn't get into the hands of bad players" (Mack Dep. 173:15–24), that the company "research[es] the heck out of" potential customers to ensure legitimacy (*id.* at 106:15–18), and that it only works with customers it believes have good causes and privacy policies (*id.* at 19:8–12).

### ii. PublicNSA Knew the Plaintiffs Felt the Brunt of the Harm in New Jersey

PublicNSA's testimony establishes that the brunt of the harm from its conduct is felt in New Jersey and, critically, that PublicNSA knew it was dealing with New Jersey residents before continuing disclosure.

PublicNSA admitted that it licensed the home addresses of approximately 12.2 million New Jersey adults and phone numbers for approximately 60% of those individuals. Mack Dep. 88:1–12. The individuals whose personal information is disclosed reside in New Jersey, and the privacy invasion, emotional distress, and safety risks caused by such disclosures are necessarily experienced where those individuals live.

PublicNSA maintains a New Jersey-specific privacy policy on its website that addresses Daniel's Law, acknowledges tens of thousands of New Jersey opt-out and

deletion requests, and tracks how those requests are processed. *Id*. at 156:10; 158:6–7. In responding to those requests, PublicNSA knew it was communicating with New Jersey residents, applying New Jersey law, and making decisions about whether New Jersey residents' data would continue to be disclosed. PublicNSA's extensive customer-vetting practices further reflect its understanding that misuse of this data could lead to serious harm, including harm at individuals' homes. Mack Dep. 173:15–24; 106:15–18. That harm, when suffered by New Jersey residents, is suffered in New Jersey.

The timing of this knowledge is legally significant. PublicNSA's challenged disclosures occurred after it received New Jersey-specific opt-out communications and after it had actual knowledge that the information at issue concerned New Jersey residents. This sequence distinguishes this case from *Hasson*.

In *Hasson*, the Third Circuit affirmed dismissal of wiretapping claims against Papa John's because Papa John's only learned that the geolocation data belonged to forum residents after the allegedly tortious collection had already occurred. 114 F.4th 181 at 192. The court emphasized that the lack of pre-collection knowledge defeated express aiming. *Id.* Here, by contrast, PublicNSA had notice. It knew before continuing to license and disclose the data that the information concerned New Jersey residents, that New Jersey law applied, and that New Jersey residents were invoking their statutory rights. That advance knowledge distinguishes it from the

27

facts of *Hasson* and lands it squarely within the category of *Calder, Johnson, Goldfarb* and *Briskin*. *See supra* Section I.A.2-3.

Because PublicNSA continued its disclosures after receiving and responding to New Jersey-specific opt-out requests, the resulting privacy invasion, emotional distress, and safety risks were not only foreseeable but knowingly inflicted on New Jersey residents in New Jersey.

### iii. *PublicNSA Admits it Expressly Aimed its Conduct at New Jersey*

PublicNSA offers six products, all of which use New Jersey home addresses and New Jersey telephone numbers. Mack Dep. 88:21–23; 91:4–10. Its products allow customers to specifically request only New Jersey data, including names and home addresses of New Jersey residents *(id*. at 117:6–17), and customers can obtain such New Jersey data in bulk *(id*. at 114:22–115:6). Customers sometimes seek New Jersey data in particular, are free to redisclose it, and pay more to obtain New Jersey data than they would if New Jersey data were excluded. *Id.* at 79:2–14; 145:4–8; 154:23–156:6.

Crucially, PublicNSA knows that customers are seeking New Jersey data before any disclosure occurs. No customer can access data without personal approval from PublicNSA's CEO, Brad Mack *(id*. at 106:25–107:10; 17:12–15), and access requires a negotiated statement of work defining the geographic scope of the data,

including whether New Jersey data is included (*id*. at 115:23–116:3; 116:11–15). If a customer wishes to add New Jersey data later, a new statement of work is required. *Id*.

PublicNSA also expressly targets New Jersey in obtaining the data its products use. It specifically acquires New Jersey home addresses and telephone numbers (*id*. at 44:10–21) from multiple companies (*id*. at 44:10–21; 47:16–48:2; 48:12–14; 49:4–10; 55:11–16), including companies with a New Jersey presence.

PublicNSA's CEO further testified that, as part of customer vetting, he consults with trusted contacts by phone and email to confirm information about potential customers, and that some of those contacts may be located in New Jersey. *Id*. at 112:19–113:11. That consultation underscores that PublicNSA's New Jersey-focused decision-making is deliberate, informed, and ongoing.

### 2. *Jurisdiction Exists Under the Traditional Purposeful-Availment Test*

PublicNSA also satisfies the traditional test for specific jurisdiction. PublicNSA's CEO confirmed that PublicNSA has "minimum contacts with the forum state that show the defendant took a deliberate act reaching out to do business in that state" and that "give rise to—or relate to—the plaintiff's claims." *Hepp v. Facebook*, 14 F.4th 204, 207 (3d Cir. 2021). Specifically, PublicNSA knowingly, intentionally, and repeatedly transacts with New Jersey-based businesses and New

Jersey-based company principals to obtain and profit from New Jersey home address and telephone number data. Indeed, these substantial New Jersey contacts are critical to PublicNSA's business in two key ways.

*First*, during the relevant time period, PublicNSA licensed or sold data to at least four New Jersey customers. Mack Dep. 131:13–25 (identifying a "total of four" "customers from New Jersey"). These New Jersey customers did not become customers through their own unilateral action. PublicNSA's sales team actively targets potential new customers and uses "lead generation" data to identify potential new customers. *Id*. at 31:6-13, 94:4-6, 94:23-95:11. Moreover, becoming a PublicNSA customer required executing three separate agreements—a nondisclosure agreement (NDA), a master services agreement (MSA), and a statement of work (SOW) – before a customer can obtain any data. *Id*. at 123:16–20; 113:22–114:18. These agreements are negotiated, requiring back and forth interactions with these New Jersey customers or New Jersey-based executives by telephone, video conference and email. *Id.* at 113:22–114:18. Indeed, PublicNSA's CEO is personally aware each time that the company transacts with New Jersey entities because he approves each customer and requires such information be provided. *Id.* at 109:14-23. Even after a customer is approved, customers cannot simply go onto the PublicNSA website, unilaterally enter a credit card number and obtain data. Each sale to a New Jersey customer is intentional on the part of

30

PublicNSA and is done pursuant to an agreed upon Statement of Work (SOW). *Id.* at 106:25–107:10; 115:23–116:3; 116:11–15.   In 2024 and 2025, PublicNSA generated nearly $2 million in revenue from its New Jersey contacts.  (Mack Dep. *Id.* at 134:7–23; 137:10-17; 148:23–150:5; 142:9–143:9; 144:8–14.

Second, during the relevant time period, PublicNSA also *purchased* data from two New Jersey businesses, and that data included New Jersey home addresses and phone numbers. *Id.* at 47:16-48:2, 50:12-14, 81:5-8, 83:9-22. PublicNSA purchased such data to validate its own data, and validating such data is important to PublicNSA's business model. *Id.* at 59:15–60:9.

Details regarding PublicNSA contacts with the specific businesses it identified as New Jersey customers follow:[5]

---

[5]    In its Motion to Dismiss, PublicNSA argues that it had "no active engagements" with New Jersey customers "at the time of the January 2024 events alleged in the Complaint."  PublicNSA MTD, ECF No. 15-1, at 12.  PublicNSA's argument is both factually and legally erroneous.   Not only is this statement contradicted by the testimony of PublicNSA's CEO, who discussed active engagements with New Jersey-based customers in January 2024, but it misunderstands the relevant time period in the Complaint.  Plaintiffs sent their Daniel's Law requests in January 2024, and PublicNSA was required to cease disclosing such information within ten days.  Each time that PublicNSA disclosed or otherwise made available Plaintiffs' home addresses or phone numbers thereafter is a Daniel's Law violation, and the Complaint alleges such violations, and Plaintiffs believe the violations continue to this day.  Therefore, the relevant time period for New Jersey contacts includes contacts up to (and even after) the filing of the complaint. *See e.g. Mellon Bank (East) PSFS v. Farino,* 960 F.2d 1217, 1224 (3d Cir.1992) (minimum contacts inquiry may include events occurring before, during and after the event giving rise to the cause of action).

- <u>VentiveIQ</u>: At the time that PublicNSA began purchasing data from VentiveIQ, it knew VentiveIQ was based in New Jersey. Mack Dep. 81:5–8. PublicNSA actively reached out to VentiveIQ to acquire data from it (*id.* at 72:8–16), and negotiated and executed an NDA, MSA, and SOW by video conference and email, which involved "going back and forth" with their contact in New Jersey on the terms of these agreements. *Id.* at 75:4–23. The data PublicNSA purchased from VentiveIQ includes New Jersey home addresses. Mack Dep. 50:12-14. PublicNSA began purchasing this New Jersey data between the time the Daniel's Law requests were sent by Plaintiffs and the filing of the complaint. *Id.* at 73:15-74:4. In addition, for the past "three to four years," PublicNSA has licensed and/or sold its data to VentiveIQ. *Id.* at 137:10–17. Such sales have generated revenue of approximately $100,000 per year in recent years. *Id.*

- <u>Belardi Wong</u>: Belardi Wong is registered and headquartered in New Jersey (*id.* at 138:13–139:7). After going through PublicNSA's vetting process, Belardi Wong and PublicNSA executed an NDA, MSA, and SOW, and Belardi Wong was accepted as a customer in or around January 1, 2025 (*id.* at 139:5-12). This process involved approximately 40 video conferences and so many emails that PublicNSA was unable to estimate a number. *Id.* at 139:13-141:4. Belardi Wong purchased New Jersey home addresses with

32

associated names on a monthly basis, generating approximately $150,000 in 2025 revenue. *Id.* at 142:9–143:9; 144:8–14. By the time that this complaint was filed on August 30, 2025, PublicNSA had been selling New Jersey home addresses to Belardi Wong for four months.

- Audience Acuity: Beginning in 2019 and continuing monthly through today, PublicNSA has processed data for Audience Acuity that includes both New Jersey home addresses and phone numbers. *Id.* at 134:7–23. PublicNSA sold large numbers of New Jersey data to Audience Acuity. PublicNSA estimates that is has "provided" 12.2 million New Jersey home addresses to Audience Acuity, and it estimates having provided "60 percent of the 12.2 million" in New Jersey phone numbers. *Id.* at 150:20–151:5. The *only* person that PublicNSA interacts with at Audience Acuity is its Chief Financial Officer, who is based exclusively in New Jersey. *Id.* at 82:11–83:8. PublicNSA negotiated its Audience Acuity agreements with this New Jersey-based CFO by phone and email. *Id.* at 82:11–83:8. PublicNSA has generated approximately $800,000 per year in revenue from Audience Acuity since 2023, including $400,000 from data processing. *Id.* at 134:7–23; 148:23–150:5. In addition, PublicNSA has been continuously *obtaining* data from Audience Acuity since 2019 (again through Audience Acuity's New Jersey-based CFO). *Id.* at 83:9-83:22. The data that PublicNSA obtains from

Audience Acuity also includes New Jersey home addresses and phone numbers. *Id.* at 47:16–48:2.

- Bridge: Bridge is another New Jersey-based customer of PublicNSA. *Id.* at 134:24-136:22. PublicNSA sold New Jersey home address data to the New Jersey-based Bridge sometime in the past 18 months. *Id.* at 147:14–21. In doing so, PublicNSA conducted approximately 10 video conferences with Bridge in New Jersey. While a one-time customer only, PublicNSA generated revenue from its transaction with Bridge. *Id.* at 131:13–20; 134:24–135:25. In other words, at the time that PublicNSA sold this New Jersey home address data to Bridge for profit, PublicNSA had already received the Daniel's Law requests from Plaintiffs (which were sent starting in January 2024).

On its own, PublicNSA's purposeful contacts with these New Jersey businesses demonstrate sufficient minimum contacts with New Jersey to support specific jurisdiction. "The minimum contacts requirement is satisfied so long as the contacts resulted from the defendant's purposeful conduct and not the unilateral activities of the plaintiff." *Venuto v. Atlanstis Motor Group,* LLC, 2018 WL 2134035, at * 3 (D.N.J. May 9, 2018) (finding specific jurisdiction over defendant where it "solicit[ed] business and attempt[ed] to close a deal" with a New Jersey citizen by "email, telephone, and texts"). As the Supreme Court has explained, "even a single act can support jurisdiction," which "may not be avoided merely because

34

the defendant did not *physically* enter the forum state." *Burger King*, 471 U.S. at 475 n.18. Many courts have held that the solicitation of business from residents of a particular state, even if that solicitation occurs over the internet or the telephone, is sufficient to support the exercise of jurisdiction. *See, e.g.*, *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 452 (3d Cir. 2003) (If a web site operator "knowingly conducts business with forum state residents via the site, then the 'purposeful availment' requirement is satisfied."). Here, PublicNSA chose to sell and/or obtain New Jersey home addresses and/or phone numbers from New Jersey businesses, negotiated multiple agreements with New Jersey businesses, and its CEO specifically approved each exchange of information *before* the exchange took place – these contacts clearly resulted from PublicNSA's purposeful conduct and not the unilateral activity of New Jersey residents.

Nor can there be any doubt that Plaintiffs' claims "arise from or is related to" PublicNSA's New Jersey activities. Plaintiffs contend that PublicNSA violated Daniel's Law by continuing to disclose or otherwise make available its home addresses or phone numbers ten days after they sent Daniel's Law notices to PublicNSA in January 2024 and before (and even after) the filing of this Complaint. (Compl. ¶¶ 52–55.) PublicNSA concedes that it disclosed New Jersey addresses and phone numbers to its New Jersey customers during this time period. Moreover, it validated such data based on information it received from New Jersey companies

35

and/or based on its New Jersey contacts during this time period. Mack Dep. 50:12–52:18. In other words, the information it obtained from New Jersey companies supported its disclosures of home addresses and/or phone numbers. The unlawful disclosure of information alleged in the Complaint was likely made to PublicNSA's New Jersey customers. Plaintiffs' claims are clearly related to PublicNSA's New Jersey contacts. *See e.g. Ford Motor Co. v. Montana Eight Jud. Dist. Ct.* 592 U.S. 351, 363 (2021) (holding that no causal relationship is required between the claims and the forum state contacts).

While these contractual relationships with New Jersey contacts that allow PublicNSA to obtain and sell New Jersey home addresses and phone numbers are ample contacts to support specific jurisdiction, they are not PublicNSA's only New Jersey contacts. As noted above, PublicNSA also maintains a New Jersey-specific section of its privacy policy. This policy is located on its website, and the New Jersey section is clearly directed to New Jersey residents so that they can obtain information about how their privacy requests have been handled. The website explicitly acknowledges receiving tens of thousands of Opt Out and/or Deletion requests from New Jersey residents. Mack Dep. Ex. 3 at 32 (acknowledging 34,309 requests). These tens of thousands of contacts from New Jersey residents are not mere unilateral communications. PublicNSA's website acknowledges that it took action on these requests from New Jersey residents with the understanding that these

36

communications were from New Jersey residents. *Id.* PublicNSA claims to have applied Daniel's Law to the requests, and further informs New Jersey residents that it denied 3,261 Daniel's law requests. *Id.* PublicNSA also states that it processed these requests in a median time of five days. *Id.* And its CEO testified that he became "familiar with New Jersey privacy policies" within the scope of his duties as CEO, including by "pay[ing] dearly' for a law firm to ensure that the company is keeping on top of such laws. Mack Dep. 22:22–23:3; 26:11–14)  In short, PublicNSA took specific actions in response to communications from New Jersey residents, with the knowledge that they were interacting with such residents and based on PublicNSA's interpretation of New Jersey law.  These communications and actions under New Jersey law reflect PublicNSA's invocation of the benefits and protections of New Jersey law and its expectation of being regulated by New Jersey. *Id.* at 156:10; 158:6–7; 22:1–4; 26:11–14.

Exercising specific jurisdiction over PublicNSA under these circumstances comports with fair play and substantial justice. Courts look at factors including the "forum state's interest, in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," and "the interstate juridical system's interest in obtaining the most efficient resolution of controversies and the shared interests of the several states in furthering fundamental substantive social policies." *See e.g. Burger King,* 471 U.S. at 476-77. Here, New Jersey has a strong interest in

protecting its residents from the actions of out-of-state businesses that are felt in New Jersey. New Jersey has also evinced a more specific interest in the kind of injury at issue here by adopting Daniel's law to protect its law enforcement officers, judges, and prosecutors from harmed suffered by the disclosure of personal data. The individuals affected by PublicNSA's conduct are all located in New Jersey. Moreover, the most efficient forum to adjudicate the controversy is New Jersey, which is familiar with Daniel's Law and where there are other similar cases pending in front of this very court. Finally, and importantly, PublicNSA knowingly and intentionally bought and sold the home addresses and phone numbers of New Jersey residents from New Jersey-based businesses, became informed about the New Jersey law that applied to disclosure of such information, invited communications from New Jersey residents about such disclosures, communicated with New Jersey residents about their data, and applied New Jersey law in determining whether to accede to the requests by New Jersey residents. There is nothing unfair about asking PublicNSA to defend claims from these residents in New Jersey.

### D. TrueSoftware[6]

#### 1. Jurisdiction Exists Under the Calder Effects Test
##### i. TrueSoftware Acted Intentionally

TrueSoftware argues that it did not itself collect, publish, or disclose New Jersey residents' information and at most, it provided only technology or high-level oversight to other entities that independently operated the platform. But TrueSoftware's testimony undermines this attempt to avoid personal jurisdiction by invoking corporate form. Although TrueSoftware has asserted that it generally houses EU data, its witness admitted that TrueSoftware does access and store U.S. and New Jersey data in defined circumstances. Specifically, when a New Jersey or U.S. spammer calls a European Truecaller user, TrueSoftware records and retains the call logs, including the U.S. or New Jersey phone number, in the European database. Espelund Dep. 140:11–25. TrueSoftware further admitted that it has the technical ability to conduct cross-database searches in certain instances, meaning that data is not rigidly firewalled by geography or category. Espelund Dep. 144:3–10 (testifying that "it would be possible for TrueSoftware to do a cross-basis search in certain instances"). This testimony confirms that TrueSoftware's interaction with

---

[6] Attached as Exhibit D to the Parikh declaration is the relevant excerpts from the deposition of Ola Espelund ("Espelund Dep."). Ola Espelund is the 30(b)(6) witness designated by TrueSoftware Scandinavia, AB ("TrueSoftware").

New Jersey-related data is not accidental or technologically impossible, but instead the result of intentional system design and discretionary access.

TrueSoftware also acknowledged that data privacy is a core operational concern monitored at the group level, and that the company actively tracks and responds to changes in privacy law across jurisdictions. Espelund Dep. 173:4–7. These admissions confirm purposeful conduct, not inadvertent data handling. *See Walden*, 571 U.S. 277 at 286 ("[Jurisdiction] over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum.").

### ii. *TrueSoftware Knew the Plaintiffs Felt the Brunt of the Harm in New Jersey*

TrueSoftware acknowledged that the nondisclosure requests concerned New Jersey residents and that disclosure of personal information can create safety and privacy risks. Espelund Dep. 183:5–17. When New Jersey residents' phone numbers and related data are processed, retained, or insufficiently suppressed after notice, the resulting invasion of privacy, emotional distress, and risk of unwanted contact are necessarily experienced where those individuals live—in New Jersey.

Because TrueSoftware continued its conduct after learning that New Jersey residents were invoking statutory rights, the resulting harm was not only foreseeable but knowingly inflicted in the forum. That pre-continuation knowledge satisfies the

40

express-aiming requirement the Third Circuit identified as dispositive. *See Hasson*, 114 F.4th 181 at 196.

### iii. *TrueSoftware Expressly Aimed its Conduct at New Jersey*

TrueSoftware's witness admitted familiarity with Daniel's Law and understood that individuals covered by that statute may send nondisclosure requests to companies. Espelund Dep. 14:16–25. TrueSoftware learned of the Daniel's Law nondisclosure requests within weeks of their submission (Espelund Dep. 193:17–23) and understood based on the content of the complaints and customer-support tickets that the requests came from New Jersey residents (Espelund Dep. 204:18–205:7).

Importantly, TrueSoftware did not merely receive this information after the fact. TrueSoftware's witness testified that he personally became involved at the group-management level in evaluating the Daniel's Law nodisclosure requests, even though the requests were sent to Truecaller International, because of the magnitude of the issue and questions raised by the subsidiary. Espelund Dep. 199:3–23; 200:7–16. During this investigation, TrueSoftware continued to process data while determining whether the requests were genuine. Espelund Dep. 199:3–23 (testifying that it "took us a while to investigate this"). TrueSoftware had advance notice that the data at issue concerned New Jersey residents, deliberated at the group-management level, and continued its conduct during that period. That pre-

41

continuation knowledge satisfies the express-aiming requirement recognized in *Hasson*. *Hasson*, 114 F.4th 181 at 196.

TrueSoftware's express aiming is further confirmed by its regulatory posture. Espelund testified that TrueSoftware is familiar with U.S. privacy regimes such as the California Consumer Privacy Ac (Espelund Dep. 173:12–16), regularly cooperates with governments worldwide to suppress disclosure of sensitive officials' data, and would be willing to do the same in the United States if requested (Espelund Dep. 181:7–182:10). These admissions demonstrate that TrueSoftware understands jurisdiction-specific privacy risks and deliberately chooses how to respond.

### 2. *Jurisdiction Exists Under the Traditional Purposeful-Availment Test*

TrueSoftware has purposefully availed itself of New Jersey through deliberate, forum-directed conduct. TrueSoftware owns and controls the Truecaller brand and domain, and the Truecaller platform is globally available in approximately 150 countries, including the United States. Espelund Dep. 174:15–16. TrueSoftware further controls how data is processed and how privacy compliance is handled at the group level, including responding to nondisclosure requests implicating U.S. and New Jersey law. Espelund Dep. 199:3–23; 200:7–16.

TrueSoftware's technical systems are designed to ingest New Jersey-related data in defined circumstances (Espelund Dep. 140:11–25) and to permit cross-

database access when needed (Espelund Dep. 144:3–10). Combined with its acknowledged familiarity with New Jersey privacy law and group-level decision-making regarding New Jersey requests, these facts establish deliberate engagement with the forum—not random or fortuitous contact. Thus, these contacts evidence that TrueSoftware "'systematically served a market in [New Jersey] for the very [information] that the plaintiffs allege[]…injured them in'" the forum. *Hasson*, 114 F.4th at 193 (quoting *Ford Motor*, 592 U.S. at 365). TrueSoftware's own testimony confirms that its New Jersey-related conduct is the very conduct at issue, satisfying the "arise out of or relate to" requirement for specific jurisdiction.

### E. Quantarium[7]

#### 1. *Jurisdiction Exists Under the Calder Effects Test*
##### i. *Quantarium Acted Intentionally*

Quantarium's testimony establishes intentional conduct. Quantarium operates a centralized "data lake" that it uses to provide services to lenders, appraisal companies, and insurance-related customers. Cannon Dep. 56:9–16. That data is not segregated by market, customer type, or geography. Cannon Dep. 56:17–19.

Quantarium affirmatively processes and provides valuations and reports that include New Jersey-specific property data. There are no internal geographic

---

[7] Attached as Exhibit E to the Parikh declaration is the relevant excerpts from the deposition of Malcom Cannon ("Cannon Dep."). Malcom Cannon is the 30(b)(6) witness designated by Quantarium Alliance, LLC and Quantarium Group, LLC ("Quantarium").

restrictions preventing Quantarium from providing services involving New Jersey properties, including large portfolios of New Jersey addresses. Cannon Dep. 60:3–24. Quantarium also generates recurring reports that can be sorted by state, including New Jersey, confirming that New Jersey-specific data is intentionally collected, maintained, and used. Cannon Dep. 95:17–20 (testifying that monthly reports can be sorted by state). This is not accidental data processing. Quantarium's unified data infrastructure, lack of geographic exclusions, and intentional state-level reporting establish purposeful and deliberate conduct involving New Jersey data. *See Walden*, 571 U.S. 277 at 286 ("[Jurisdiction] over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum.").

### ii.  Quantarium Knew the Plaintiffs Felt the Brunt of the Harm in New Jersey

When New Jersey residents experience privacy harms arising from Quantarium's continued use and dissemination of New Jersey property data, those harms are necessarily felt in New Jersey. Quantarium's testimony also establishes that the brunt of the harm from its conduct is felt in New Jersey and, critically, that Quantarium knew it was dealing with New Jersey residents before continuing its conduct.

Quantarium acknowledged that it receives requests through its website and email relating to personal data and privacy concerns, forwards those requests to its

44

syndicator Black Knight for potential changes, and then continues to monitor for updates while the data remains in use. Cannon Dep. 81:2–16 (testifying regarding the process of forwarding requests to Black Knight and monitoring for updates). This process confirms that Quantarium continues to use New Jersey data after receiving notice that an individual has raised a concern.

Quantarium's witness also testified that he was aware Quantarium had been sued in litigation involving New Jersey-based claims and data issues, and that Black Knight was implicated in that context. Cannon Dep. 12:22–13:12. Thus, Quantarium knew that its data practices implicated New Jersey residents and New Jersey law before continuing its conduct. Quantarium received New Jersey-specific communications, escalated them internally, forwarded them to its data provider, and continued to use the data with knowledge that New Jersey residents were invoking privacy rights. That pre-continuation knowledge satisfies the express-aiming requirement the Third Circuit identified as dispositive. *See Hasson*, 114 F.4th 181 at 196.

### iii. *Quantarium Expressly Aimed its Conduct at New Jersey*

Quantarium knowingly does business with New Jersey-based customers and affirmatively tracks revenue attributable to New Jersey. Its witness testified that, in response to discovery, Quantarium calculated revenue attributable to New Jersey by auditing its billing system and identifying customers whose business addresses were

located in New Jersey, and that only customers with New Jersey billing addresses were included in that calculation. Cannon Dep. 65:25–66:9. That admission establishes that Quantarium treats New Jersey as a distinct commercial market and affirmatively derives revenue from it.

Quantarium also knowingly relies on a primary data vendor—Black Knight—that is registered to do business in New Jersey. Cannon Dep. 28:23–29:2; 68:17–21. Quantarium has used Black Knight since its inception, making New Jersey-linked data sourcing a foundational part of its operations.

In addition, Quantarium receives legal and opt-out communications through legal@quantarium.com, an inbox monitored by multiple personnel, with issues escalated to senior leadership—including the deponent himself—when they raise legal or compliance concerns. Cannon Dep. 78:18–79:20. Quantarium thus knowingly reviews and evaluates requests that raise New Jersey-related privacy issues.

Taken together, these facts establish that Quantarium deliberately directed its conduct toward New Jersey commercially, operationally, and legally.

### 2. Jurisdiction Exists Under the Traditional Purposeful-Availment Test

Quantarium knowingly earns revenue from New Jersey-based customers, identifies those customers through internal billing audits, and attributes revenue

46

specifically to New Jersey. Cannon Dep. 65:25–66:9. Quantarium also relies on a primary data provider registered to do business in New Jersey (Cannon Dep. 28:23–29:2; 68:17–21), and its unified data lake incorporates New Jersey data without segregation (Cannon Dep. 56:9–19).

Quantarium has no policy excluding New Jersey from its services and affirmatively provides valuations, reports, and analytics involving New Jersey properties. Cannon Dep. 60:3–24; 95:17–20. These are deliberate, ongoing business activities directed at New Jersey satisfying the traditional purposeful-availment test. *See Hasson*, 114 F.4th at 193 (quoting *Ford Motor*, 592 U.S. at 365).

## III.    DEFENDANTS CANNOT SHOW THAT EXCERCISING JURISDICTION IS UNCONSTIUTIONAL.

Under these facts, Defendants cannot demonstrate that exercising jurisdiction over these Defendants is "unconstitutional" or would violate notions of "fair play and substantial justice." *Mellon Bank (E.) PSFS, Nat. Ass'n,* 960 F.2d 1217 at 1226 ("Once the plaintiff has made a prima facie case for personal jurisdiction based on minimum contacts, the burden falls upon the defendant to show that the assertion of jurisdiction is *unconstitutional*.'") (emphasis in original). Here, Defendants' primary argument is that they should not be subject the New Jersey jurisdiction because their business is conducted generally everywhere; but that does not insulate Defendants from the specific conduct challenged in the Complaints. Jurisdiction is neither unfair

47

nor unreasonable where, as discovery confirms, Defendants knowingly disseminated New Jersey-specific information at scale, received New Jersey-specific notices invoking statutory protections, escalated those issues within their organizations, and nevertheless continued their practices. Defendants are sophisticated entities that monetize location-specific data, and maintain compliance processes tailored to jurisdiction-specific legal regimes. Having chosen to profit from the dissemination of New Jersey-linked information—and having continued that conduct after receiving notice that it implicated New Jersey residents—Defendants cannot now claim that defending this action in New Jersey offends traditional notions of fair play or substantial justice.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motions to Dismiss in its entirety.

Respectfully submitted,

Dated: 1/21/2026

By:  /s/ Rajiv D. Parikh
RAJIV D. PARIKH

**PEM LAW LLP**
Rajiv D. Parikh
Kathleen Barnett Einhorn
Jessica A. Merejo
1 Boland Dr., Suite 101
West Orange, New Jersey 07052
Telephone: (973) 557-5700
Email: rparikh@pemlawfirm.com

48

keinhorn@pemlawfirm.com
jmerejo@pemlawfirm.com


**BOIES SCHILLER FLEXNER LLP**
Adam Shaw (admitted *pro hac vice*)
30 South Pearl Street, 12th Floor
Albany, New York 12207
Telephone: (518) 434-0600
Email: ashaw@bsfllp.com

Mark C. Mao (admitted *pro hac vice*)
Julia Bront (admitted *pro hac vice*)
44 Montgomery Street, 41st Floor
San Francisco, California 94104
Telephone: (415) 293-6800
Email: mmao@bsfllp.com
        jbront@bsfllp.com

James Lee (admitted *pro hac vice*)
100 SE Second Street, Suite 2800
Miami, Florida 33131
Telephone: (305) 357-8434
Email: jlee@bsfllp.com

Eric Palmer (admitted *pro hac vice*)
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 377-4250
Email: epalmer@bsfllp.com

*Attorneys for Plaintiffs*

49